IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETER MANJARREZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 12 C 1257 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| GEORGIA-PACIFIC LLC, and ) | |
| ILLINOIS CENTRAL RAILROAD ) | |
| COMPANY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Peter Manjarrez filed suit against several entities, including Georgia-Pacific LLC ("GP"), alleging negligence with respect to a truck accident that took place at a rail yard in Harvey, Illinois. GP argues that Plaintiff's causation expert's testimony is inadmissible and without it, GP is entitled to summary judgment. For the reasons stated below, GP's motion is denied.

**Facts**

On August 16, 2010, Plaintiff, a truck driver for Third-Party Defendant ITS Technologies & Logistics ("ITS"), was operating a hostler truck at a rail yard in Harvey, Illinois, when it turned over on its side. (Pl.'s Resp. GP's LR 56.1 Stmt., Dkt. # 165, ¶ 9.) The hostler was carrying a GP cargo container loaded with five GP paper rolls that had been loaded into the container on August 11, 2010 by personnel at GP Monticello LLC in Mississippi. (*Id*. ¶ 10.) The paper rolls collectively weighed over 36,000 pounds. (*Id*.) The container was driven from GP's Monticello premises on August 11, 2010 by Frankie Hollingbird. (*Id*.)

Hollingbird drove the truck 60 miles from Monticello to a rail yard in Richland, Mississippi, where the container was placed on a train bound for the Harvey yard. (*Id*. ¶ 11.) There is no evidence that a load shift occurred during the time Hollingbird drove the container to Richland. (*Id*.) By August 16, 2010, the container arrived at the Harvey, Illinois yard where ITS moved it from the rail car to Plaintiff's hostler[1] via a reach stacker. (*Id*. ¶ 12.)

---

[1] While the term hostler is often used to describe a person who drives trucks or tractors at vehicle parking or docking areas to move or position them, *see* http://www.occupationalinfo.org/90/909663010, the parties use the term here to refer to the actual truck that Plaintiff drove, to which the container at issue was attached.

1

The hostler tipped over while Plaintiff was backing up at a slight angle without a spotter at a speed of approximately 2 to 3 miles per hour. (*Id.* ¶ 13.) Over a year before the accident at issue, in response to a prior tip over of a hostler carrying a loaded container, Plaintiff's supervisors had advised "all employees" that they should back up as straight as they could because "we have no idea what these cargo containers have in them at any time." (*Id.* ¶ 14.) Plaintiff alleges that he operated the hostler safely and that GP's purported improper loading of the container in Mississippi caused the truck to tip over. (*Id.* ¶ 15.)

Plaintiff disclosed a sole liability expert, Richard Norton, a former flatbed truck driver with no college education. (*Id.* ¶ 16.) He opined in his written report that GP's loading pattern was the "cause of the hostler and container tip over that occurred on August 16, 2010" and claimed to hold his opinion "within a reasonable degree of certainty." Specifically, Norton's report stated that all of the following were causes for the tip over:

1. The paper rolls were loaded improperly under the Association of American Railroad Intermodal Loading Guide.
2. The paper rolls were loaded with unequal weight with more weight being loaded on the left or driver's side of the container.
3. There were no void fillers used within the container to prevent the paper rolls from shifting during transport.
4. The paper roll closest to the nose was loaded hard to the nose in the left corner of the container rather than being centered hard to the nose.
5. There was no wood blocking, or bracing used to further prevent the paper rolls shifting or moving during transport.
6. GP failed to properly train their personnel on the proper method to load, brace and block five (5) rolls of 58.5" diameter corrugated paper.

(Norton Expert Opinion, GP Ex. 5, Dkt. # 156-3, at 4.)

Plaintiff does not have a specific background in engineering or physics, or specialties that would allow him to do accident reconstruction analysis. (*Id.* ¶ 18.) Norton testified that he has never driven a spotting truck or hostler in a rail yard, but has had experience driving a hostler hooked up to a container in a truck yard. (*Id.* ¶ 22.) Norton hauled empty intermodal containers during his prior truck driving career, but not loaded containers. (*Id.* ¶ 23.) Aside from bringing empty intermodal containers to a rail yard, Norton was never involved with the kind of containers at issue in this case. (*Id.*) Norton became familiar with the Intermodal Loading Guide for the purpose of reviewing materials in this case, but has not used the Intermodal Loading Guide in his own practice or since he began as a trucker. (*Id.* ¶ 25.)

GP's liability expert is S. Paul Singh, Ph.D., CPP, an engineer and Professor Emeritus at Michigan State University. (*Id.* ¶ 26.)

2

**Analysis**

<u>Is Plaintiff's Expert Testimony Admissible</u>?

GP challenges Plaintiff's causation expert on the ground that he is unqualified, his opinion is unreliable and the testimony will not assist the jury. Federal Rule of Evidence ("Rule") 702 governs the use and admissibility of expert testimony. "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)); *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). As noted by the Seventh Circuit:

> Under [Rule] 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."

*Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (citation omitted). The party seeking to introduce the expert testimony bears the burden of proving by a preponderance of the evidence that the testimony satisfies Rule 702. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

    1.    *Is Plaintiff's expert qualified?*

GP first contends that Norton is unqualified to offer testimony on how the accident was caused because he has no college degree and testified that he has no specific background in engineering, physics, or accident reconstruction analysis. Under Rule 702, a party may introduce an expert opinion if the witness has the requisite "knowledge, skill, experience, training, or education." Anyone who has relevant expertise and can offer opinion testimony that is helpful to a judge or jury may qualify as an expert witness. *See Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Thus, in assessing an expert's qualifications, a court should consider the proposed expert's full range of education, experience, and training. *LG Elec. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 951 (N.D. Ill. 2009).

In support of his expert, Plaintiff notes that Norton has the following background and qualifications, among other things:

- He has worked in the commercial transportation industry for over 37 years.
- He has several professional affiliations, including being a member of the Washington Trucking Association, the North American Transportation Management Institute, and the Accident Reconstruction Network.
- He has served as a safety and training instructor for the commercial trucking industry since 1993.
- He has received instruction and training regarding the North American Standards of Load Securement and is familiar with the Association of

- American Railroads Intermodal Loading Guide.
- He served as the Safety Director for Sound Delivery Service, where he taught load securement, including how to spot unsafe loads and how to secure loads to prevent movement while in transit.
- 

(Pl.'s Resp., Dkt. # 167, at 6; Norton Expert Opinion, GP Ex. 5, Dkt. # 156-3, at 1.) Norton also states in his resume that he has investigated or analyzed over 450 large truck accidents and has acted as an expert witness in at least eleven cases. (Norton Expert Opinion, GP Ex. 5, Dkt. # 156-3, at 1, 2.)

Relying on this Court's decision in *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp.2d 717, 721 (N.D. Ill. 2001), GP contends that Norton is unqualified to give expert testimony. The Court, however, finds *Traharne* distinguishable. In that case, the decedent had been electrocuted when he attempted to use a sump pump to drain water from a swimming pool. *Id*. at 719. The plaintiff, the decedent's sister, asserted that the pump should have had a supplemental restraint to "protect against the possibility that the pump's strain relief clamp would fail and allow water to enter the pump, become electrified, and expose the [user] to electric shock." *Id*. The plaintiff hired an expert to design a supplemental restraint system for the pump and estimate the cost for manufacturing and shipping the part. *Id*. at 720. This Court agreed with the magistrate judge's ruling that the expert was not qualified to offer the opinion he was giving, stating:

> [The expert] does not have any engineering design or physics degrees and has had no training in mechanical or electrical engineering. [The expert], in fact, is not even a college graduate. He completed two years of general studies at the University of Illinois. [The expert] has not published or lectured on any subject involving sump pump design or safety. [The expert] also has no experience or familiarity with the sump pump manufacturing industry. He has never before designed a sump pump or a sump pump strain relief system.

*Id*. at 721.

Here, however, Norton is not designing or engineering an alternative mechanism as the expert in *Traharne* did. Thus, the concern with specific knowledge of engineering principles is not present here. Norton has been hired to testify as to load securement and the cause of the tip over due to load shift. He has worked in the commercial trucking industry for over 37 years, received training regarding the North American Standards of Load Securement and has taught load securement. Moreover, he has experience driving a hostler truck. The Court concludes that Norton is qualified to testify to the relevant issues. *Spearman Indus. Inc. v. St. Paul Fire and Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1096 (N.D. Ill. 2001) (rejecting challenge to qualifications of roofing expert, finding that proposed expert's "practical experience [was] extensive," he "grew up in the roofing business" and "worked in various phases of the roofing industry his entire life"). GP may cross-examine Norton to highlight any perceived weaknesses in his experience and qualifications.

2. *Is his opinion reliable*?

Rule 702 requires that the expert explain the "methodologies and principles" that support

4

his opinion, and he cannot simply assert a "bottom line." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010); *see also United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (rejecting expert testimony where expert "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so'"). Nevertheless, the Committee Advisory notes for Rule 702 state that "[i]n certain fields, experience is the predominate, if not sole, basis for a great deal of reliable testimony." Fed. R. Evid. 702 advisory committee's note.

GP argues that Norton's causation testimony is not reliable because it has no scientific basis and is premised on assumptions rather than an underlying methodology. GP notes that in his deposition, when asked if there was physical evidence to support his opinion of a load shift, Norton responded, "It's based on my experience with loads and with the blocking and bracing, I think that would be a good assumption." (Norton Dep., Pl.'s Ex. 13, Dkt. # 172-6, at 89:5-7.) Norton also offered the following testimony:

> Q: Can you tell me to a reasonable degree of scientific and engineering certainty what the cause or causes were of why this hostler and container tipped over?
>
> A: Engineering certainty, I don't have an engineering degree. I can't give you an opinion on that. . . .
>
> . . .
>
> A: The – all the depositions that I read describing the way the load was loaded point me to the fact that yes, it was off balance, unbalanced and it was not properly blocked and braced. Those two things combined lead me to believe that that was the cause of that tip over.
>
> Q: Have you done any kind of an engineering or scientific analysis as far as weight distribution, centers of gravity, centripetal forces, degree of radius of turns or any of alike in support of any opinion as to the cause or causes of why this tipped over?
>
> A: No.
>
> Q: And that is something that would be outside your expertise; correct?
>
> A: Yes.

(*Id*. at 89:19-90:19.) Upon questioning by his own attorney, when asked if he had experience securing loads into containers, Norton stated that he had experience with load securement on flatbeds and vans, but not containers. (*Id*. at 100:10-101:4.)

In his report, Norton indicates that he formed his opinion by reviewing the following documents, among others:

5

- Equipment Accident Report
- All incident reports
- Report of CN police officer investigating the incident
- Bill of Lading
- Photographs of the container and materials inside
- CAD drawings prepared by John Green depicting load patterns
- Association of American Railroads Intermodal Loading Guide

(Norton Expert Opinion, GP Ex. 5, Dkt. # 156-3, at 1.) He also reviewed the depositions of several individuals including, among others: (1) Plaintiff; (2) John Green, Senior Manager of Damage Prevention and Freight Claims for ICR; (3) Eric Graf, Special Agent with the ICR Police Department; and (4) Robert Jordan, ITS's Terminal Manager for the Harvey Yard. Green, Graf and Jordan all participated in the investigation and/or reporting of the accident at issue. (*Id.*)

While Norton may not have used a scientific method in arriving at his conclusion, his opinion is based on his experience in load securement and his review of the relevant documents and testimony about the accident. *Traharne*, 156 F. Supp. 2d at 724 (denying motion to exclude expert testimony on ground that expert did not examine pump, stating that expert's opinion was "based on documents given to him, his experience, specialized knowledge, academic training, and observations and research he has previously conducted" and any flaws in expert's analysis were to be raised on cross-examination). Again, GP can fully explore any perceived weaknesses or unreliability in Norton's opinion during cross-examination.

3. *Will Norton's testimony assist the jury?*

Finally, GP asserts that Norton's testimony will not assist the jury because he is not qualified and his conclusions are based on assumptions. Because the Court has already discussed these grounds for exclusion, it does not address them again here. Moreover, while GP touts the qualifications of its expert relative to Plaintiff's, it is not this Court's job to make credibility determinations regarding the expert's opinions on summary judgment. *Chamberlain Grp., Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 951 (N.D. Ill. 2010) ( "It is indeed true that a 'battle of the experts' can preclude summary judgment").

Plaintiff, while asserting that his expert's testimony is admissible, also argues that expert testimony is unnecessary in this case and even without such testimony, summary judgment should be denied since a genuine issue of material fact exists as to causation. The Court need not cover this argument because it has concluded that Norton's testimony is admissible.

**Conclusion**

For the reasons stated above, the Court does not exclude Norton's testimony. Accordingly, GP's motion for summary judgment on the ground that Plaintiff has no admissible expert testimony causally connecting the alleged negligence of GP to his purported injuries is denied.

Date: July 16, 2013                                      _____

**Ronald A. Guzmán**
**United States District Judge**